**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| MARVIN TRAYLOR, DECEASED, BY LORI TRAYLOR | |
| Plaintiff, | **Case No. _____** |
| v. | **COMPLAINT FOR DAMAGES** |
| SYNGENTA AG, SYNGENTA CROP PROTECTION, LLC,.; and DOES 1 through 60 inclusive, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Lori Traylor (hereinafter, referred to as "Plaintiff") is the surviving heir and representative of Decedent, Marvin Traylor (hereinafter, referred to as "Decedent"). Plaintiff and Decedent, by and through counsel of OnderLaw, LLC alleges upon information and belief and complains of Defendants Syngenta AG ("SAG") and Syngenta Crop Protection, LLC ("SCPLLC") (together with their predecessors-in-interest, referred to collectively as the "Syngenta Defendants"); and Does One through Sixty, states:

**STATEMENT OF THE CASE**

1.     Decedent suffered from Parkinson's disease caused by his exposure to the herbicide Paraquat.

2.     Decedent was at all relevant times a resident of California. Plaintiff is likewise a California resident.

3.     Decedent was exposed to Paraquat, was injured, and developed Parkinson's disease in California.

4.     Defendants are companies that have manufactured, distributed, licensed, marketed, and sold Paraquat for use in the United States, including in the State of Decedent's exposure.

5.     Plaintiff brings this action to recover damages for personal injuries resulting from the injured Decedent's exposures to Paraquat manufactured, distributed, and sold by Defendants.

6.     Defendants' tortious conduct, including their negligent acts and omissions in the research, testing, design, manufacture, marketing, and sale of Paraquat, caused Plaintiff's injuries. At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that Paraquat was a highly toxic substance that can cause severe neurological injuries and impairment, and should have taken steps in their research, manufacture, and sale of Paraquat to ensure that people would not be harmed by foreseeable uses of Paraquat.

## JURISDICTION

7.     This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiffs and each Defendant. Indeed, Plaintiff is a resident of California; Decedent was at all relevant times a resident of California; SPLLC is a Delaware limited liability company with its principal place of business in Greensboro, North Carolina (SPLLC is a wholly-owned subsidiary of Defendant SAG); SAG is a foreign corporation with its principal place of business in Basel, Switzerland. Defendants are all either incorporated and/or have their principal place of business outside of the state in which the Plaintiff resides.

8.     The amount in controversy between Plaintiff and Defendants exceeds $75,000.00, exclusive of interest and cost.

**VENUE**

9.     Venue is proper in the Southern District of Illinois pursuant to CMO 1 of MDL 3004 stating that any plaintiff whose case would be subject to transfer to MDL 3004 may file his or her case directly in MDL 3004 in the Southern District of Illinois.

10.     If not for CMO 1, venue is proper within the Central District of California pursuant to 28 U.S.C. § 1391 in that Defendants conducted business here and are subject to personal jurisdiction in this district.

11.     This Court has personal jurisdiction over each of the Defendants in this diversity case because the State Court of California would have jurisdiction, in that:

    a.     Defendant and/or its predecessor(s), together with those with whom they were acting in concert, manufactured Paraquat for use as an active ingredient in Paraquat products, distributed Paraquat to formulators of Paraquat products, formulated Paraquat products, marketed and/or distributed Paraquat products to the State of Decedent's exposure and its agricultural community, Paraquat products, intending that such products regularly would be, and knowing they regularly were, sold and used in that State;

    b.     Plaintiff's claims against each Defendant arise out of these contacts between the Defendant and/or its predecessor(s), together with those with whom they were acting in concert, with the State of Decedent's exposure; and

    c.     These contacts between each Defendant and/or its predecessors, together with those with whom they were acting in concert, and the State of Decedent's exposure were so regular, frequent, and sustained as to provide fair warning that it might be hauled into court there, such that requiring it to defend this action in that State does not offend traditional notions of fair play and substantial justice.

## PARTIES

12.     The true names or capacities whether individual, corporate, governmental, or associate, of the defendants named herein as Does are unknown to Plaintiff who therefore sues said defendants by such fictitious names. Plaintiff prays leave to amend this Complaint to show their true names and capacities and/or basis for liability when the same have been finally determined.

13.     Plaintiff is informed and believes, and upon such information and belief, alleges that each of the defendants designated herein as Doe is strictly, negligently, or otherwise legally responsible in some manner for the events and happenings herein referred to, and negligently or otherwise caused injury and damages proximately thereby to Plaintiff as is hereinafter alleged.

14.     At all times herein mentioned each and every of the Defendants was the agent, servant, employee, joint venture, alter ego, successor-in-interest, and predecessor-interest of each of the other, and each was acting within the court and scope of this agency, service, employment, joint venture, alter ego relationship, and corporate interrelationship.

15.     U.K. manufacturer Imperial Chemical Industries Ltd. a/k/a Imperial Chemical Industries PLC ("ICI") first introduced Paraquat to world markets in or about 1962 under the brand name GRAMOXONE®.

16.     In or about 1971, ICI created or acquired a wholly owned U.S. subsidiary organized under the laws of the State of Delaware, which was ultimately known as ICI Americas Inc. ("ICI Americas").

17.     Chevron Chemical Company was a corporation organized under the laws of the State of Delaware.

18.     Pursuant to distribution and licensing agreements with ICI and ICI Americas, Chevron Chemical Company had exclusive rights to distribute and sell Paraquat in the United States and did in fact manufacture, formulate, distribute, and sell Paraquat in the United States, from approximately 1964 until approximately 1986.

19.     Chevron U.S.A Inc. is the successor-in-interest to Chevron Chemical Company.

20.     At all relevant times, Chevron Chemical Company acted as the agent of Chevron U.S.A. Inc. in selling and distributing Paraquat in the U.S. At all relevant times, Chevron Chemical Company was acting within the scope of its agency in selling and distributing Paraquat. Chevron U.S.A. Inc. is liable for the acts of its agent.

21.     From approximately 1964 through approximately 1986, pursuant to the distribution and licensing agreements with Chevron Chemical Company, SAG's and/or SCPLLC's predecessors-in-interest, ICI and ICI Americas, and Does One through Sixty manufactured some or all of the Paraquat that Chevron Chemical Company distributed and sold in the United States, including in the State of Plaintiff's exposure for use in that State.

22.     From approximately 1964 through approximately 1986, pursuant to distribution and licensing agreements between and among them, ICI, ICI Americas, Chevron Chemical Company, and Does One through Sixty acted in concert to register, manufacture, formulate, and distribute and sell (through Chevron Chemical Company) Paraquat for use in the U.S., including in the State of Decedent's exposure for use in that State, and their respective successors-in-interest, SAG, SCPLLC, , are jointly liable for the resulting injuries alleged herein.

23.     After 1986, SCPLLC, Does One through Sixty, and/or their predecessors-in-interest sold and distributed and continue to sell and distribute Paraquat in the United States, including in the State of Decedent's exposure for use in that State.

24. As a result of mergers and corporate restructuring, SAG is the successor-in-interest to ICI.

25. As a result of mergers and corporate restructuring, SCPLLC is the successor-in-interest to ICI Americas, Inc.

26. Thus, from approximately 1964 through the present, the Syngenta Defendants, Does One through Sixty, or their predecessors-in-interest have manufactured, formulated, distributed, and sold Paraquat for use in the U.S., including in the State of Decedent's exposure for use in that State.

**DECEDENT'S EXPOSURE TO PARAQUAT**

27. On information and belief, at all relevant times, Decedent was exposed to Paraquat between approximately 1994 to 2004 in California: (1) when it was mixed, loaded, applied, and/or cleaned; (2) as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants.

28. At all relevant times, it was reasonably foreseeable that when Paraquat was used in the intended or a reasonably foreseeable manner, users of Paraquat and persons nearby would be exposed to it.

29. At all relevant times, it was reasonably foreseeable that Paraquat could enter the human body: (1) through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage were present); (2) through the olfactory bulb; (3) through respiration into the lungs; and (4) through ingestion into

the digestive tract of small droplets swallowed after entering the mouth, nose, or conducting airways.

## PARAQUAT CAUSES PARKINSON'S DISEASE

30.     At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could ultimately enter the brain.

31.     At all relevant times, it was reasonably foreseeable that Paraquat that entered a human body could induce the misfolding of the alpha synuclein protein.

32.     Parkinson's disease is a progressive neurodegenerative disorder of the brain that affects primarily the motor system—the part of the central nervous system that controls movement.

33.     The characteristic symptoms of Parkinson's disease are its "primary" motor symptoms: resting tremor (shaking movement when the muscles are relaxed), bradykinesia (slowness in voluntary movement and reflexes), rigidity (stiffness and resistance to passive movement), and postural instability (impaired balance).

34.     Parkinson's disease's primary motor symptoms often result in "secondary" motor symptoms such as freezing of gait; shrinking handwriting; mask-like expression; slurred, monotonous, quiet voice; stooped posture; muscle spasms; impaired coordination; difficulty swallowing; and excess saliva and drooling caused by reduced swallowing movements.

35.     Non-motor symptoms—such as loss of or altered sense of smell; constipation; low blood pressure on rising to stand; sleep disturbances; and depression—are present in most cases of Parkinson's disease, often for years before any of the primary motor symptoms appear.

36.     There is currently no cure for Parkinson's disease; no treatment will stop or reverse its progression; and the treatments most commonly prescribed for its motor symptoms tend to

become progressively less effective, and to increasingly cause unwelcome side effects, the longer they are used.

37.    One of the primary pathophysiological hallmarks of Parkinson's disease is the selective degeneration and death of dopaminergic neurons (dopamine-producing nerve cells) in a part of the brain called the substantia nigra pars compacta ("SNpc").

38.    Dopamine is a neurotransmitter (a chemical messenger that transmits signals from one neuron to another neuron, muscle cell, or gland cell) that is critical to the brain's control of motor function (among other things).

39.    The death of dopaminergic neurons in the SNpc decreases the production of dopamine.  Once dopaminergic neurons die, they are not replaced; when enough dopaminergic neurons have died, dopamine production falls below the level the brain requires for proper control of motor function, resulting in the motor symptoms of Parkinson's disease.

40.    The presence of Lewy bodies (insoluble aggregates of a protein called alphasynuclein) in many of the remaining dopaminergic neurons in the SNpc is another of the primary pathophysiological hallmarks of Parkinson's disease.

41.    Dopaminergic neurons are particularly susceptible to oxidative stress, a disturbance in the normal balance between oxidants present in cells and cells' antioxidant defenses.

42.    Scientists who study Parkinson's disease generally agree that oxidative stress is a major factor in—if not the precipitating cause of—the degeneration and death of dopaminergic neurons in the SNpc and the accumulation of Lewy bodies in the remaining dopaminergic neurons that are the primary pathophysiological hallmarks of the disease.

43.    Paraquat is highly toxic to both plants and animals, creating oxidative stress that causes or contributes to cause the degeneration and death of plant or animal cells.

44.     Paraquat creates oxidative stress in the cells of plants and animals because of "redox properties" that are inherent in its chemical composition and structure: it is a strong oxidant, and it readily undergoes "redox cycling" in the presence of molecular oxygen, which is plentiful in living cells.

45.     The redox cycling of Paraquat in living cells interferes with cellular functions that are necessary to sustain life—with photosynthesis in plant cells, and with cellular respiration in animal cells.  The redox cycling of Paraquat in living cells creates a "reactive oxygen species" known as superoxide radical, an extremely reactive molecule that can initiate a cascading series of chemical reactions that creates other reactive oxygen species that damage lipids, proteins, and nucleic acids—molecules that are essential components of the structures and functions of living cells.  Because the redox cycling of Paraquat can repeat indefinitely in the conditions typically present in living cells, a single molecule of Paraquat can trigger the production of countless molecules of destructive superoxide radical.

46.     Paraquat's redox properties have been known to science since at least the 1930s.

47.     It has been scientifically known since the 1960s that Paraquat (due to its redox properties) is toxic to the cells of plants and animals.  The same redox properties that make Paraquat toxic to plant cells and other types of animal cells make it toxic to dopaminergic neurons in humans—that is, Paraquat is a strong oxidant that interferes with the function of, damages, and ultimately kills dopaminergic neurons in the human brain by creating oxidative stress through redox cycling.

48.     Paraquat is one of only a handful of toxins that scientists use to produce animal models of Parkinson's disease, i.e., use in a laboratory to artificially produce the symptoms of Parkinson's disease in animals.

49.     Animal studies involving various routes of exposure have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons in the SNpc, other pathophysiology consistent with that seen in human Parkinson's disease, and motor deficits and behavioral changes consistent with those commonly seen in human Parkinson's disease.

50.     Hundreds of in vitro studies (experiments in a test tube, culture dish, or other controlled experimental environment) have found that Paraquat creates oxidative stress that results in the degeneration and death of dopaminergic neurons (and many other types of animal cells).

51.     Epidemiological studies have found that exposure to Paraquat significantly increases the risk of contracting Parkinson's disease.  A number of studies have found that the risk of Parkinson's disease is more than double in populations with occupational exposure to Paraquat compared to populations without such exposure.

52.     These convergent lines of evidence (toxicology, animal experiments, and epidemiology) demonstrate that Paraquat exposure generally can cause Parkinson's disease.

## PARAQUAT REGULATION

53.     The Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7 U.S.C. § 136 et seq., which regulates the distribution, sale, and use of pesticides within the U.S., requires that pesticides be registered with the U.S. Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA. *See* 7 U.S.C. 136a(a).

54.     The California state laws which regulate the labeling, distribution, use, and application of pesticides within the States, requires that pesticides be registered with the California Department of Pesticide Regulation.

55.     Paraquat is a "restricted-use pesticide" under federal law, which means it cannot be sold, used, or possessed by any person in Illinois without the proper licensing and permitting.

56.     As part of the pesticide registration process, the EPA requires, among other things, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment.

57.     As a general rule, FIFRA requires registrants, the chemical companies registered to sell the pesticides, to perform health and safety testing of pesticides. However, FIFRA does not require the EPA itself to perform health and safety testing of pesticides, and the EPA generally does not perform such testing.

58.     The EPA registers (or re-registers) a pesticide if it is persuaded, based largely on studies and data submitted by the registrant, that: (1) its composition is such as to warrant the proposed claims for it, (*See* 7 U.S.C. § 136a(c)(5)(A)); (2) its labeling and other material required to be submitted comply with the requirements of FIFRA, (*See* 7 U.S.C. § 136a(c)(5)(B)); (3) it will perform its intended function without unreasonable adverse effects on the environment, (*See* 7 U.S.C. § 136a(c)(5)(C)); and (4) when used in accordance with widespread and commonly recognized practice it will not generally cause unreasonable adverse effects on the environment, (*See* 7 U.S.C. § 136a(c)(5)(D)).

59.     FIFRA defines "unreasonable adverse effects on the environment" as "any unreasonable risk to man or the environment, taking into account the economic, social and environmental costs and benefits of the use of any pesticide." *See* 7 U.S.C. § 136(bb).

60.     Under FIFRA, "[a]s long as no cancellation proceedings are in effect registration of a pesticide shall be prima facie evidence that the pesticide, its labeling and packaging comply with the registration provisions of [FIFRA]." *See* 7 U.S.C. § 136a(f)(2). However, FIFRA further

provides that "[i]n no event shall registration of an article be construed as a defense for the commission of any offense under [FIFRA]." *Id*.

61.     The distribution or sale of a pesticide that is misbranded is an offense under FIFRA, which provides in relevant part that "it shall be unlawful for any person in any State to distribute or sell to any person … any pesticide which is … misbranded." *See* 7 U.S.C. § 136j(a)(1)(E). A pesticide is misbranded under FIFRA if, among other things: (1) its labeling bears any statement, design, or graphic representation relative thereto or to its ingredients which is false or misleading in any particular, (*See* 7 U.S.C. § 136(q)(1)(A)); (2) the labeling accompanying it does not contain directions for use which are necessary for effecting the purpose for which the product is intended and if complied with, together with any requirements imposed under section 136a(d) of this title, are adequate to protect health and the environment, (*See* 7 U.S.C. § 136(q)(1)(F)); or (3) the label does not contain a warning or caution statement which may be necessary and if complied with, together with any requirements imposed under section 136a(d) of this title, is adequate to protect health and the environment," (*See* 7 U.S.C. § 136(q)(1)(G)).

62.     As a result, a pesticide may be misbranded despite an EPA determination that it met FIFRA's registration criteria.  In other words, notwithstanding its registration, a pesticide is misbranded if its label contains "false or misleading" statements, has inadequate instructions for use, or omits warnings or cautionary statements necessary to protect human health. Similarly, a pesticide may be found to cause unreasonable adverse effects on humans when used according to the approved label despite a determination by the EPA that it would not.

63.     Plaintiff does not seek in this action to impose on Defendants any labeling or packaging requirement in addition to or different from those required under FIFRA.  Any allegation in this Complaint that a Defendant breached a duty to provide adequate directions for

the use of or warnings about Paraquat, breached a duty to provide adequate packaging for Paraquat, concealed, suppressed, or omitted to disclose any material fact about Paraquat, or engaged in any unfair or deceptive practice regarding Paraquat, is intended and should be construed to be consistent with that alleged breach, concealment, suppression, or omission, or unfair or deceptive practice having rendered the Paraquat "misbranded" under FIFRA.  However, Plaintiff brings claims and seeks relief in this action only under state law and does not bring any claims or seek any relief in the action under FIFRA.

**Acts of Syngenta Defendants**

64.     SAG is a foreign corporation organized and existing under laws of Switzerland, with its principal place of business in Basel, Switzerland.  It is a successor by merger or continuation of business to its corporate predecessors, including but not limited to ICI.

65.     SCPLLC is a limited liability company organized under the laws of the State of Delaware.  It is a successor by merger or continuation of business to its corporate predecessors, including but not limited to ICI Americas. SCPLLC is registered with the State of California Secretary of State to do business in the state of California.

66.     SCPLLC or its corporate predecessors have sufficient minimum contacts with the state of Decedent's exposure and have purposefully availed themselves of the privileges of conducting business there, in that they:

a.     Secured and maintained the registration of Paraquat products and other pesticides with the CDPR to enable themselves and others to manufacture, distribute, sell, and use these products there; and

b.     Marketed, licensed, advertised, distributed, sold, and delivered Paraquat and other pesticides to chemical companies, licensees, distributors, and dealers whom they

expected to distribute and sell Paraquat and other pesticides in or for use in the state of Decedents'

exposure, including the Chevron Defendants and "Syngenta Retailers," as well as to applicators

and farmers there; and

c.     From approximately 1964 through approximately 1986, pursuant to

distribution and licensing agreements with SAG's and/or SCPLLC's predecessors-in-interest, the

California-based Chevron Defendants had exclusive rights to distribute and sell Paraquat in the

United States and did in fact manufacture, formulate, distribute, and sell Paraquat in the United

States, including in the state of Decedent's exposure for use in that State.

67.     SCPLLC's contacts with that State are related to or gave rise to this controversy.

68.     SAG exercises an unusually high degree of control over SCPLLC, such that

SCPLLC is the agent or mere instrumentality of SAG.

69.     SCPLLC's contacts with that State are thus imputed to SAG for purposes of

jurisdiction.

## DEFENDANTS' TORTIOUS CONDUCT RESULTED IN DECEDENTDEVELOPING PARKINSON'S DISEASE

70.     Plaintiff hereby refers to, incorporates, and re-alleges by this reference as though

set forth in full, each and every allegation hereinabove and makes them a part of the following

allegations.

71.     Decedent was at all relevant times a resident of Cayucos, California. Plaintiff is a

resident of Cayucos, California.

72.     Decedent was exposed to Paraquat manufactured and sold by Defendants.

73.     On information and belief, at all relevant times, Decedent was exposed to Paraquat

between approximately 1994 and 2004 in California: (1) when it was mixed, loaded, applied,

and/or cleaned; (2) as a result of spray drift (the movement of herbicide spray droplets from the target area to an area where herbicide application was not intended, typically by wind); and/or (3) as a result of contact with sprayed plants.

74.     During this time, Decedent was in close contact with and exposed to the Paraquat that was designed, manufactured, and distributed by Defendants.

75.     The Paraquat to which Decedent was exposed entered Decedent's body through absorption or penetration of the skin, mucous membranes, and other epithelial tissues (including tissues of the mouth, nose and nasal passages, trachea, and conducting airways, particularly where cuts, abrasions, rashes, sores, or other tissue damage are present): and/or 2) through the olfactory bulb; and/or 3) through respiration into the lungs; and/or 4) through ingestion into the digestive tract of small droplets swallowed after entering the mouth, nose or conducting airways. Once absorbed, the Paraquat entered the bloodstream, attacked the nervous system, and was a substantial factor in causing Decedent to suffer Parkinson's disease.

76.     Decedent was diagnosed with Parkinson's disease in approximately October of 2020.

77.     Stating in the alternative, within the time period of any applicable statute of limitations, Plaintiff could not have discovered through the exercise of reasonable diligence that exposure to Paraquat is injurious to human health.

78.     Plaintiff did not discover and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of Paraquat, nor would a reasonable and diligent investigation by Plaintiff have disclosed that Paraquat would cause Decedent's Parkinson's disease.

79.     The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' misrepresentations and concealment. Through affirmative misrepresentations and omissions, Defendants actively concealed from Decedent the true risks associated with use of Paraquat.

80.     As a result of Defendants' actions, Decedent could not reasonably have known or learned through reasonable diligence that he had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

81.     Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Paraquat. Defendants had a duty to disclose the true character, quality, and nature of Paraquat because it was non-public information over which Defendants continue to have control. Defendants knew that this information was not available to Decedent, Decedent's medical providers, and/or health facilities, yet Defendants failed to disclose the information to the public, including Decedent.

82.     Defendants had the ability to and did spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Decedent and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

83.     Defendants' acts and omissions were a legal, proximate, and substantial factor in causing Decedent to suffer severe and permanent physical injuries, pain, mental anguish, and disability, that continued for the remainder of Decedent's life.

84.     It became necessary for Decedent to incur expenses from medical care and treatment, and related costs and expenses required in the care and treatment of said injuries.

85. Decedent suffered general (non-economic) damages that Plaintiff is entitled to recovering in a sum in excess of the jurisdictional minimum of this court.

86. Decedent suffered special (economic) damages that Plaintiff is entitled to recovering in a sum in excess of the jurisdictional minimum of this court.

## CAUSES OF ACTION

## COUNT I – STRICT PRODUCTS LIABILITY DESIGN DEFECT

87. Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

88. Defendants are liable to Plaintiff under a products liability theory for marketing a defectively designed product, as well as for failing to adequately warn of the risk of severe neurological injury caused by chronic, low-dose exposure to Paraquat.

89. At all relevant times the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use in the United States, including in the state of Decedent's exposure,

90. At all relevant times and places, the Paraquat that the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold was used in the intended or a reasonably foreseeable manner.

91. Decedent was exposed to Paraquat that the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold. As a result of that exposure, Paraquat entered Decedent's body causing them to develop Parkinson's disease.

92. The Paraquat that the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold did not perform as safely as

an ordinary consumer would have expected it to perform when used in the intended or a reasonably foreseeable manner, in that:

   a.   As designed, manufactured, formulated and packaged Paraquat was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed (or areas near where it had been sprayed); and

   b.   When inhaled, ingested, or absorbed into the body, it was likely to cause neurological damage that was both permanent and cumulative, and repeated low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

   93.   Alternatively, the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' Paraquat products were defectively designed in that the risk of danger inherent in the challenged design outweighed the benefits of such design, considering, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design.

   94.   The design defect existed when the Paraquat left the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' possession and control.

   WHEREFORE, Plaintiff respectfully requests that this Court enter judgement in Plaintiff's favor for compensatory and punitive damages for the harms caused to Decedent, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT II – STRICT PRODUCTS LIABLITY FAILURE TO WARN

95.     Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

96.     Defendants are also liable to Plaintiff under a products liability theory based on their failure to adequately warn of the risks of Paraquat.

97.     When the Syngenta defendants, Does One through Sixty, and their corporate predecessors manufactured and sold the Paraquat to which Plaintiff was exposed, it was known or knowable to the Syngenta defendants, Does One through Sixty, and their corporate predecessors in light of scientific knowledge that was generally accepted in the scientific community that:

a.     Paraquat was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.     When inhaled, ingested, or absorbed into the body, it likely caused latent neurological damage that was both permanent and cumulative, and that repeated, low-dose exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

98.     The risk of contracting Parkinson's disease from chronic, low-dose exposure to Paraquat presented a substantial danger to users of Paraquat when the product was used in a reasonably foreseeable manner.

99.     An ordinary consumer would not have recognized the potential risk of permanent, irreversible neurological damage, including the risk of contracting Parkinson's disease, from chronic, low-dose exposure to Paraquat.

100.    The Syngenta defendants, Does One through Sixty, and their corporate predecessors failed to warn of the potential risk of permanent, irreversible neurological damage from chronic, low-dose exposure to Paraquat, and failed to provide adequate instructions regarding avoidance of these risks.

101.    As a direct and proximate result of the Syngenta defendants, Does One through Sixty, and their corporate predecessors' marketing a defective product, Decedent suffered the injuries described in this Complaint.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgement in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper.  Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT III - NEGLIGENCE

102.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

103.    At all relevant times, the Syngenta defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use nationally, including the State of Decedent's exposure.

104.    Decedent was exposed to Paraquat, that the Syngenta defendants, Does One through Sixty, and their corporate predecessors manufactured and sold.

105.    The Paraquat to which Decedent was exposed was used in the intended or reasonably foreseeable manner.

106.    At all times relevant to this claim, in researching, designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, the Syngenta defendants, Does One through

Sixty, and their corporate predecessors owed a duty to exercise ordinary care for the health and safety of the persons whom it was reasonably foreseeable could be exposed to Paraquat, including Decedent.

107.   When the Syngenta defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, packaged, labeled, distributed, and sold the Paraquat to which Decedent was exposed, it was reasonably foreseeable that Paraquat:

a.   Was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

b.   When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

108.   In breach of the aforementioned duty to Decedent the Syngenta Defendants, Does One through Sixty, and their corporate predecessors negligently:

a.   Failed to design, manufacture, formulate, and package Paraquat to make it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

b.   Designed, manufactured, and formulated Paraquat such that it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease;

      c.     Failed to conduct adequate research and testing to determine the extent to which exposure to Paraquat was likely to occur through inhalation, ingestion, and absorption into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed;

      d.     Failed to conduct adequate research and testing to determine the extent to which Paraquat spray drift was likely to occur, including its propensity to drift, the distance it was likely to drift, and the extent to which Paraquat spray droplets were likely to enter the bodies of persons spraying it or other persons nearby during or after spraying;

      e.     Failed to conduct adequate research and testing to determine the extent to which Paraquat was likely to cause or contribute to cause latent neurological damage that was both permanent and cumulative, and the extent to which repeated exposures were likely to cause or contribute to cause clinically significant neurodegenerative disease, including Parkinson's disease;

      f.     Failed to direct that Paraquat be used in a manner that would have made it unlikely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

      g.     Failed to warn that Paraquat was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause clinically significant neurodegenerative disease, including Parkinson's disease.

109.   The Syngenta Defendants, Does One through Sixty, and their corporate predecessors knew or should have known that users would not realize the dangers of exposure to Paraquat and negligently failed to take reasonable steps to prevent the foreseeable risk of harm from exposure to Paraquat.

110.     As a direct and proximate result of the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' negligence, Decedent suffered the injuries described in this Complaint.

111.     Additionally, in the course of designing, manufacturing, packaging, labeling, distributing, and selling Paraquat, the Syngenta Defendants, Does One through Sixty, and their corporate predecessors violated laws, statutes, and regulations, including but not limited to: sections of Food & Agriculture Code, Division 7, Chapter 2 (Pesticides).

112.     Decedent was a member of the class of persons that said laws, statutes, and regulations were intended to protect.

113.     The Syngenta Defendants, Does One through Sixty's violations of said laws, statutes, and regulations were also substantial factors in causing Decedent's injuries.

114.     The injuries that resulted from the Syngenta Defendants, Does One through Sixty's violations were the kind of occurrence the laws, statutes, and regulations were designed to protect.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### COUNT IV – BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

115.     Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

116.     At all relevant times, the Syngenta Defendants, Does One through Sixty, and their corporate predecessors engaged in the business of designing, manufacturing, distributing, and

selling Paraquat and other restricted-use pesticides and held themselves out as having special knowledge or skill regarding Paraquat and other restricted-use pesticides.

117.    At all relevant times, the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold Paraquat for use nationally, including the state of Decedent's exposure.

118.    Decedent was exposed to Paraquat that, the Syngenta Defendants, Does One through Sixty, and their corporate predecessors designed, manufactured, distributed, and sold.

119.    The Paraquat to which Decedent was exposed was not fit for the ordinary purposes for which it was used, and in particular:

    a.    It was designed, manufactured, formulated, and packaged such that it was likely to be inhaled, ingested, and absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed; and

    b.    When inhaled, ingested, or absorbed into the bodies of persons who used it, who were nearby while it was being used, or who entered fields or orchards where it had been sprayed or areas near where it had been sprayed, it was likely to cause neurological damage that was both permanent and cumulative, and repeated exposures were likely to cause neurodegenerative disease, including Parkinson's disease.

120.    As a direct and proximate result of, the Syngenta Defendants, Does One through Sixty, and their corporate predecessors' breach of implied warranty, Plaintiff suffered the injuries herein described.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein expended,

attorneys' fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT VI – SURVIVAL ACTION PURSUANT TO REVISED CALIFORNIA STATUTE 377.34

121.    As a direct and proximate result of the negligence, wrongful acts and/or omissions on the part of the Defendants as set forth herein above, Decedent suffered injury and damages prior to his death. This action is therefore brought pursuant to Revised California Code of Civil Procedure §377.34 for the benefit of the Estate of. Marvin Traylor.

122.    As a direct and proximate result of the negligence, wrongful acts and/or omissions on the part of the Defendants set forth herein above, Decedent sustained personal injuries, underwent medical and other related treatment, incurred medical and other related expenses, and sustained pain and suffering prior to his death.

123.    As a direct and proximate result of the acts, delicts and/or omissions on the part of the Defendants set forth herein above, Plaintiff, the surviving heir and representative of Decedent, is accordingly entitled to recover for damages from the Defendants based upon personal injuries sustained by Decedent prior to his death.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein expended, attorneys' fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

## COUNT V – PUNITIVE DAMAGES

124.    Plaintiff incorporates by reference each allegation set forth in preceding paragraphs as if fully stated herein.

125.    Defendants' conduct as alleged herein was done with oppression, fraud, and malice. Defendants were fully aware of the safety risks of Paraquat. Nonetheless, Defendants deliberatively crafted their label, marketing, and promotion to mislead farmers and consumers.

126.    This was not done by accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing the agricultural industry that Paraquat did not cause Parkinson's Disease, and that full disclosure of the true risks of Paraquat would limit the amount of money Defendants would make selling Paraquat in the State Decedent's exposure and elsewhere. Defendants' objective was accomplished not only through its misleading labeling, but through a comprehensive scheme of selective fraudulent research and testing, misleading advertising, and deceptive omissions as more fully alleged throughout this pleading. Decedent was denied the right to make an informed decision about whether to purchase, use, or be exposed to an herbicide, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Decedent's rights.

127.    There is no indication that Defendants will stop their deceptive and unlawful marketing practices unless they are punished and deterred. Accordingly, Plaintiff requests punitive damages against the Defendants for the harms caused to Decedent.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all relief as this Court deems just and proper. Additionally, Plaintiff demands a jury trial on all issues contained herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests this Court to enter judgment in Plaintiff's favor and against the Defendants for:

a. Actual or compensatory damages in such amount to be determined at trial and as provided by applicable law;

b. Exemplary and punitive damages sufficient to punish and deter the Defendants and others from future fraudulent practices;

c. Pre-judgment and post-judgment interest;

d. Costs including reasonable attorneys' fees, court costs, and other litigation expenses; and

e. Any other relief the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all triable issues within this pleading.

Dated: March 14, 2024                              Respectfully submitted,

                                                   **ONDERLAW, LLC**

                                                    /s/ *Patrick D. McMurtray*
                                                   James Onder – MO #38049
                                                   Patrick D. McMurtray – TN #31597
                                                   onder@onderlaw.com
                                                   pmcmurtray@onderlaw.com
                                                   110 E. Lockwood, 2nd Floor
                                                   St. Louis, MO 63119
                                                   (314) 963-9000 Telephone
                                                   (314) 963-1700 Facsimile

                                                   *Attorney for Plaintiff*